# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| v. | : | NO. 17-254-3 |
| **HUMBERTO ALMONTE** | : | |
| *Defendant* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                 NOVEMBER 9, 2018

# MEMORANDUM OPINION

**INTRODUCTION**

Pursuant to Federal Rule of Criminal Procedure 12, Defendant Humberto Almonte ("Defendant" or "Almonte") filed a *motion to suppress* statements he allegedly made to federal law enforcement agents following his arrest. (Doc. 64). In the motion, Defendant denies that he was properly advised of or understood his rights under the Fifth Amendment of the United States Constitution, and *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny (his "*Miranda* rights"). (*See* Doc. 64 at ¶7). In its opposition to Defendant's motion, the Government disagrees and argues that an arresting officer properly advised Defendant of his *Miranda* rights in Spanish, and that Defendant understood his rights and voluntarily waived them prior to making the statements that the Government seeks to admit. (*See* Doc. 76 at 7).

On October 11, 2018, a suppression hearing was held at which time the Government presented the testimony of three federal officers; *to wit*: Task Force Officer Brian Myers ("Officer Myers"), Task Force Officer James Cullen ("Officer Cullen"), and Task Force Officer Eric Ramos ("Officer Ramos"). Though Defendant cross-examined each of the Government's witnesses, he did not testify or call witnesses of his own.

At issue is whether the Government has met its burden of proof to establish (1) that law enforcement officers properly advised Defendant of his *Miranda* rights prior to initiating a custodial interrogation, and (2) that Defendant voluntarily and knowingly waived his *Miranda* rights prior to making his statements to law enforcement. After carefully weighing the evidence, this Court finds that the Government has not met its burden of proof. Therefore, Defendant's motion to suppress is granted.

**SUMMARY OF FACTS**

The following is a summary of the relevant facts derived from the testimony of the Government's witnesses offered at the suppression hearing, and the exhibits presented:

> Officer Myers testified that he is a Philadelphia police officer who has worked in narcotics for nearly twenty years and has been assigned to the FBI Narcotics Task Force for approximately seven years. (October 11, 2018 Hearing Transcript ("Tr.") at 61:23-62:5). Likewise, Officer Cullen testified that he is a Philadelphia police officer who has been assigned to the FBI task force for approximately nine years. (Tr. at 43:22-44:4). Officer Ramos testified that he is a SEPTA transit police officer who has been assigned to FBI Task Force C3 for approximately three years. (Tr. at 9:13-15). Officer Ramos is fluent in Spanish, having grown up speaking Spanish with his family. (Tr. at 13:16-23). Neither Officer Myers nor Officer Cullen speaks or understands Spanish. (Tr. at 69:9-23, 53:13-15).
>
> During the surveillance of the 800 block of Sanger Street,[1] Officer Myers observed Defendant exit the residence at 890 Sanger Street, pass a tan plastic bag

---

[1] As background information about the narcotics investigation which led to Defendant's arrest, the Government provides the following account in its response to the motion to suppress:

On May 23, 2016, Officer Myers set up surveillance on a store that he knew sold paraphernalia used to package narcotics for street drug sales in Philadelphia. During that surveillance, he observed co-Defendant Braulizabeth Reyes ("Reyes") exit the store carrying items that he suspected were drug paraphernalia, and he followed her to 7119 Souder Street in Philadelphia. There, Officer Myers observed co-Defendant Oscar Reto ("Reto") and others enter and exit a black Honda Accord (the "Honda") that was parked in the rear of the property. At some point, a man removed a plastic bag from the Honda and discarded it in a trash can on another property. Officer Myers later retrieved the bag and discovered rubber bands commonly used to bundle heroin packets inside it. Officer Myers continued his surveillance at 7119 Souder Street the following day and observed Reto removing items consistent in shape with drug paraphernalia from a Hyundai Santa Fe (the "Hyundai") parked in the rear of the property and carrying them inside 7119 Souder Street. Reto later returned to the Hyundai and drove away. Officer Myers

to a Hispanic male sitting in the front passenger seat of the Honda, and return inside the residence. (Tr. at 65:9-18, 78:18-24). Approximately 45 minutes later, Officer Myers returned to 7119 Souder Street and observed that the Hyundai and the Honda vehicles that he had followed the previous day were parked there. (Tr. at 79:7-14).

Believing that he had witnessed Defendant engage in a narcotics transaction, Officer Myers approached the district attorney for authorization to seek a search warrant.[2] On May 25, 2016, Officer Myers obtained search warrants for 7119 Souder Street and 890 Sanger Street. (Tr. at 62:6-17). While a team of officers executed the Souder Street search warrant, Officer Myers directed Officer Cullen to set up surveillance on 890 Sanger Street and provided Officer Cullen with a description of Defendant and a Cadillac SUV that Officer Myers believed belonged to Defendant. (Tr. 63:7-15, 45:23-25). During his surveillance, Officer Cullen observed Defendant leave the Sanger Street house and drive away in the Cadillac. (Tr. 45:24-46:1). Officer Cullen advised Officer Myers of Defendant's movements via police radio. Officer Myers directed Officer Cullen to follow Defendant's vehicle until Officer Myers could join them. (Tr. 66:19-23). Once Officer Myers joined Officer Cullen, he and Officer Cullen stopped Defendant's vehicle and detained Defendant. (Tr. at 66:25-67:3). Defendant was handcuffed behind his back and placed in the rear passenger seat of Officer Cullen's pickup truck. (Tr. at 47:17-20). When Officer Cullen attempted to speak to Defendant, Defendant indicated that he did not speak English. Officer Cullen then ceased speaking to him. (Tr. at 48:2-7). The officers returned with Defendant to 890 Sanger Street, where Officers Myers and Ramos participated in the execution of the search warrant for that property while Officer Cullen waited with Defendant in the truck. (Tr. at 48:13-20). Once the search was completed, Officer Ramos approached Officer Cullen's truck and spoke to Defendant entirely in Spanish. (Tr. at 48:21-49:4).

Officer Ramos testified that before speaking to Defendant, he and Officer Cullen helped Defendant out of the truck and changed his handcuffs so that Defendant's hands were in front of him, rather than behind him. (Tr. at 17:23-25). Defendant was then returned to the rear passenger seat of Officer Cullen's vehicle, and Officer Ramos entered the front passenger seat and asked Defendant whether he wanted to help himself in the investigation. (Tr. at 17:4-18:7). Officer Ramos testified that after hesitating briefly, Defendant indicated that he did. (Tr. at 18:14-15). Officer Ramos testified that he read Defendant his rights in Spanish from a standard FBI form ("waiver form") that Officer Ramos keeps copies of in his truck. (Tr. at 18:17-20, 19:7-10). He asked Defendant "if that's how he wanted to proceed," Defendant responded "yes," and Officer Ramos asked Defendant to sign the waiver form on the provided signature line. (Tr. at 19:15-17). Officer Ramos

---

followed the Hyundai and the Honda, which the Hyundai joined at 3106 Knorr Street, to the 800 block of Sanger Street in Philadelphia. Officer Myers maintained his surveillance there, suspecting that a narcotics transaction was underway.

[2] This information was obtained from the Government's response in opposition.

testified that he perceived that Defendant understood his rights, and that he asked Defendant whether Defendant understood his rights, and Defendant replied, "yes." (Tr. at 22:12-23). Officer Ramos advised Defendant, "we're here involving a box that you handed into a window of a car the day before that contained drugs," and asked Defendant whether the drugs were his and from whom he got them. (Tr. at 23:8-11). Officer Ramos testified that Defendant responded that he gets the drugs from a man named Flacco and provided Flacco's phone number. (Tr. at 23:12-14). Defendant also told Officer Ramos that on the previous day he had handed drugs through the window of a car. (Tr. at 23:15-22). After making these statements, Defendant "pretty much terminated the conversation." (Tr. at 24:9-10). Officer Ramos testified that he summarized his conversation with Defendant on a notepad and relayed the details to Officer Myers. Both Officers Ramos and Myers testified that Officer Ramos provided Officer Myers with the signed waiver form. (Tr. at 71:15-19, 67:21-68:1).

On cross examination, Officer Ramos could not recall where he had left his notes and did not know what ultimately happened to the waiver form. (Tr. at 36:10-18). Officer Myers could not recall whether Officer Ramos had taken notes and did not know what happened to the waiver form.[3] (Tr. at 68:6-11).

Officer Cullen testified that he witnessed the conversation between Officer Ramos and Defendant, and that Officer Ramos used the same interrogation procedure with Defendant that he had used previously with other Spanish-speaking suspects. However, Officer Cullen testified that he does not understand Spanish and did not understand what was said between Officer Ramos and Defendant. (Tr. at 49:22-50:2). Officer Cullen testified that he signed the waiver form "as a witness to the situation," (Tr. at 52:16-20), but did not recall witnessing Defendant sign the form. (Tr. at 60:18-25). Officer Myers testified that he had not witnessed Officer Ramos' conversation with Defendant. (Tr. at 69:5-17).

After Officer Ramos relayed the conversation with Defendant to Officer Myers, Officer Myers proceeded to headquarters to prepare the arrest report. (Tr. at 71:13-24). The arrest report, introduced by Defendant as Exhibit D-1, indicates that: "Almonte was read his rights by Septa Officer Ramos, Almonte stated that he gets paid $2,000 for every kilo he delivers and he delivered heroin to the black Honda inside a Cheerio cereal box inside a plastic bag. Almonte also stated that he gets the kilos from a H/M named Flacco." Notably, though Officer Myers testified that the phone number "should be in there," (Tr. at 71:12), the arrest report contains neither the phone number nor any indication of whether Defendant signed and/or understood the waiver form. (D-1).

The FBI Narcotics White Paper (the "white paper") was used to cross-examined Officer Myers and introduced into the record as Exhibit D-2. Officer Myers testified that white papers are prepared by task force supervisors to

---

[3] The Government introduced a blank sample waiver form as an exhibit in lieu of the actual form which Officer Ramos testified that Defendant had signed. (Tr. at 21:14-22:2).

summarize investigation results. (Tr. at 72:4-8). Here, the white paper was prepared by an officer senior to Officer Myers. *Id.* The white paper reads, "all defendants were debriefed with negative results." (D-2). Officer Myers testified that "negative results" means the defendants did not want to talk. (Tr. at 73:8-18).

**DISCUSSION**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court developed procedural safeguards for law enforcement to follow before conducting custodial interrogations to protect an individual's Fifth Amendment privilege against self-incrimination. In doing so, "the Court recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 467). Prior to a custodial interrogation, law enforcement must "fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Id.* (citing *Miranda*, 384 U.S. at 468-70). Any statements obtained in violation of these *Miranda* safeguards, in the absence of a proper waiver, must be suppressed. *Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *Miranda*, 384 U.S. at 478-79; *see also United States v. Latz*, 162 F. App'x 113, 117 (3d Cir. 2005) ("Under *Miranda* . . . a defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant receives appropriate warnings[.]") (citing *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999)).

Here, there is no dispute that Defendant's alleged statements were made during the course of custodial interrogation. "In determining whether an individual is in custody, the ultimate inquiry is: 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Leese*, 176 F.3d at 743 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). The statements attributed to Defendant were made while he was handcuffed

in the back of Officer Cullen's vehicle and, according to Officer Cullen, while under arrest. (*See* Tr. at 54:6-8). Defendant was therefore in custody. For *Miranda* purposes, interrogation consists of either express questioning by law enforcement or its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Officer Ramos testified that he directly questioned Defendant about the drugs being investigated, whether the drugs belonged to Defendant, and from whom he obtained them. Thus, Defendant's alleged statements were made in response to custodial interrogation and are inadmissible unless the Government can show that the *Miranda* safeguards were provided.

When the Government seeks to admit statements made during custodial interrogation, it "has the burden of proving by a preponderance of the evidence that a defendant was advised of his/her rights and voluntarily and knowingly waived them." *U.S. v. Lin*, 131 F. App'x 884, 886 (3d Cir. 2005) (citing *Lego v. Twomey*, 404 U.S. 477 (1972)). To evaluate whether a defendant was properly advised of his rights, courts must simply inquire whether warnings were provided and whether they "reasonably 'convey[ed] to [a suspect] his rights as required by *Miranda*.'" *United States v. Warren*, 642 F.2d 182, 184 (3d Cir. 2011) (quoting *Duckworth v. Eagan*, 492 U.S. 195 (1989)). To determine whether rights were waived voluntarily and knowingly, courts apply a "totality of the circumstances" test. *See Colorado v. Spring*, 479 U.S. 564, 578 (1987). While "the courts must presume that a defendant did not waive his rights," and "the prosecution's burden is great," "an express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

To show that warnings were provided and that a waiver was made, the Government may offer the testimony of the interrogating police officer, any audio or video recordings of the

interrogation, and/or a *Miranda* waiver form, when available. Officer testimony that demonstrates that a suspect was properly advised of his rights and that a proper waiver was obtained, when credible, can be sufficient on its own; no physical form or signature need be produced. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370 (2010) (finding that the defendant's statement to police three hours after receiving warnings, and after refusing to sign a written waver, was sufficient to establish waiver); *United States v. Charles*, 118 F. App'x 627 (3d Cir. 2004) (finding that the defendant's answer of "yes" in response to being asked whether he was willing to make a statement could constitute a valid waiver, notwithstanding defendant's refusal to sign a waiver form). However, where a court determines that an officer's testimony is not sufficiently reliable to itself establish that warnings and waiver were proper, the Government must do more to meet its burden.

Here, resolution of the motion to suppress depends on whether the testimony of the Government's witnesses, weighed against the omissions and discrepancies highlighted by Defendant in the arrest report and the white paper, as well as the missing signed waiver form and Officer Ramos' notebook, was sufficient to establish by a preponderance of the evidence that Defendant was properly advised of his *Miranda* rights, and that he knowingly and voluntarily waived them. This Court concludes that the testimony was not sufficient, and, therefore, that the Government failed to meet its burden.

As noted, Officer Ramos testified that he read Defendant his rights from a standard, FBI-issued form designed to advise Spanish-speaking suspects of their *Miranda* rights; that he specifically asked Defendant whether he understood his rights; that Defendant replied, "yes"; and that Defendant signed the waiver form prior to providing the statements he now seeks to suppress. As corroboration, the Government offered Officer Cullen's testimony that he witnessed, though he did not understand, Officer Ramos' exchange with Defendant and believed, though he was not

7

sure, that Officer Ramos was reading Defendant his constitutional rights. Officer Myers' testimony about Officer Ramos' on-the-scene report was also offered to support Officer Ramos' testimony that he had advised Defendant of his rights and obtained from Defendant a description of a heroin delivery arrangement with Flacco, an admission that he had delivered two kilograms the previous day, and Flacco's phone number.

This Court finds that the substantial inconsistencies in the evidence, however, raise doubts about the reliability of Officer Ramos' testimony regarding his exchange with Defendant. For instance, though Officer Ramos testified that Defendant signed the waiver form and provided Flacco's phone number, the police report does not mention that Defendant signed and/or understood the waiver form, and does not include a phone number for Flacco, the reported drug supplier. Officer Myers testified that a detail as significant as a dealer's phone number should appear in a police report and yet, in this case, it does not. Officer Cullen, whose role was partly to witness Officer Ramos' interrogation of Defendant, testified that he could not recall witnessing Defendant sign the waiver form and did not understand the conversation between Officer Ramos and Defendant. The Court's hesitation to rely upon Officer Ramos' testimony is deepened further by the white paper which, as the official summary of the investigation's results, affirmatively undermines these facts when it reflects that none of the three defendants gave statements to law enforcement.

Though the Government is not required to prove or produce Defendant's signature on the waiver form, testimony was offered that a form was signed and retained by law enforcement, and yet the Government is unable to produce the form. Officer Ramos testified that he took written notes about Defendant's statement, but Officer Myers did not remember seeing any written notes, and Officer Ramos could not recall what he had done with them. Officer Cullen's testimony that

8

he witnessed Officer Ramos' exchange with Defendant provides relatively little corroborative value, as Officer Cullen did not understand any of the words being said and could not recall witnessing Defendant sign the waiver form. Officer Myers, for his part, did not witness the exchange and could only testify to what Officer Ramos told him.

This Court does not believe that the Government's witnesses were intentionally misleading about the nature of Officer Ramos' exchange with Defendant or Defendant's statement. However, the witnesses' failure to explain significant discrepancies between their memories and official reports of these events, and the Government's inability to produce documents that the witnesses testified existed, preclude this Court from accepting Officer Ramos' recollection of his exchange with Defendant. This Court is not sufficiently convinced that proper *Miranda* warnings were provided and/or that Defendant's waiver was knowing and voluntary. Thus, this Court further finds that the Government has failed to establish by a preponderance of the evidence that *Miranda* safeguards were afforded in this instance. Accordingly, Defendant's motion to suppress is granted.

**CONCLUSION**

For the reasons stated herein, Defendant's motion to suppress is granted. An Order consistent with this Memorandum Opinion follows.

NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.